# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION
    MERIAM SHAW                    )
 3                                 )
    VS.                            ) CIVIL ACTION NO.
 4                                 )      4:16-CV-01163
    KROGER TEXAS, LP               )
 5

 6

 7

 8

 9

10

11          ORAL AND VIDEOTAPED DEPOSITION OF

12                      MERIAM SHAW

13                    JANUARY 18, 2017

14                     VOLUME 1 OF 1

15

16

17

18

19

20  ORAL DEPOSITION OF MERIAM SHAW, produced as a witness,
    duly sworn by me at the instance of the Defendant, taken
21  in the above-styled and numbered cause on January 18,
    2017, from 10:26 a.m. to 1:45 p.m., before Mylinda Tubbs
22  Faircloth, Certified Shorthand Reporter No. 2896 in and
    for the State of Texas, via machine shorthand, at the
23  Law Offices of Peter Costea, 2603 Augusta, Suite 880,
    Houston, Texas 77057, pursuant to the Federal Rules of
24  Civil Procedure and any provisions stated on the record.

25
```

MERIAM SHAW - January 18, 2017

**Page 34**

1 essential functions of the position for which you are
2 applying as they are listed in the job posting with or
3 without reasonable accommodation?" And you checked
4 "yes." Do you see that?
5    A. Yes. At the time, yes.
6    Q. Okay.
7    A. I -- I never planned on getting pregnant. I
8 -- I had two kids. I only want one girl and one boy and
9 that's it. I never planned on having another one.
10    Q. Okay. But you did -- you did have an
11 opportunity to see what the job requirements would be,
12 correct?
13    A. Yes.
14    Q. All right. And you -- and you understood that
15 those job requirements, for example, would include
16 lifting?
17    A. Yes.
18    Q. And you've been in a grocery store before,
19 right?
20    A. I've been, but I never worked for a grocery
21 store before.
22    Q. But you went shopping before you --
23    A. I went shopping before.
24    Q. -- you applied at Kroger. And you saw that --
25 that sackers and checkers have to lift things when they

**Page 35**

1 go through the lines, right?
2    A. Yes.
3    Q. If you turn to Bates No. 7, and it says "hire
4 date" of "March 10th, 2014." Do you see that?
5    A. Uh-huh.
6    Q. Does that -- that sound correct to you?
7    A. Yes.
8    Q. Okay. So you applied on March 5th and you
9 were hired on March 10th?
10    A. Yes.
11    Q. Were you interviewed?
12    A. Yes.
13    Q. Who interviewed you?
14    A. What's her name? I forgot her name.
15    Q. If I told you Tiffany --
16    A. Yes.
17    Q. -- would that sound right?
18    A. Yes, Ms. Tiffany.
19    Q. Tell me about the interview.
20    A. It was -- it was accomplishing. It was -- we
21 were, like -- if I'm not mistaken, we were 10
22 applicants. And it was a group interview and it took,
23 like, two hours or something. And she even made us
24 make, like, make a role play of, How would you sell, you
25 know, this muffin or, you know, and I did -- I did good.

**Page 36**

1 I was so proud of myself.
2    Q. Okay. Where -- where did that interview take
3 place?
4    A. In the Kroger, I don't know exactly the other,
5 but it was in -- at one store of Kroger. It's not in
6 Garth Road. It's not in Baytown. It's somewhere else.
7    Q. Okay. So it's a store different from the one
8 that you ended up working at?
9    A. Yes, it's different.
10    Q. What else do you remember about the interview?
11    A. I remember that -- that she offered a job for,
12 would you -- would I like to work for a dairy
13 department, meat department, and there was night --
14 night clerk. And there was -- and I -- and I said, I
15 can't work for night or in a cold area. I don't want to
16 leave my babies at night, so -- and she said, you know,
17 What about just courtesy clerk, which is bagger, and I
18 said okay.
19    Q. Why did -- why didn't you want to work where
20 it's cold? Just a personal preference, or did -- was
21 there a reason?
22    A. Yeah, it's personal preference. I'm from the
23 Philippines.
24    Q. Okay.
25    A. I'm not used to that.

**Page 37**

1    Q. Okay. So you were allowed to pick the
2 position that you --
3    A. Yes.
4    Q. -- wanted to -- okay -- to get?
5       Let me finish my question.
6    A. Oh, sorry.
7    Q. It will be better for her.
8    A. Okay. I'm so sorry.
9    Q. That's okay. So you ended up choosing to be a
10 courtesy clerk?
11    A. Yes.
12    Q. And did you understand what that job would
13 require?
14    A. Yes, of course. I was happy, you know.
15    Q. But you were told that you would have to push
16 baskets, for example?
17    A. Yes, of course.
18    Q. And pick up bags of groceries?
19    A. Yes.
20    Q. And pick up, you know, bags of dog food or cat
21 food, whatever customers bring through the line, right?
22    A. Yes.
23    Q. Were you hired to be part-time or full-time?
24    A. Part-time.
25    Q. Was there any discussion of how many hours a

MERIAM SHAW - January 18, 2017

**Page 50**

1  Q. And in your charge you say that on March 15th
2  you discovered that you were pregnant.
3  A. Oh, one day, yes.
4  Q. Yeah. So sitting here right now, you don't
5  remember if it was the 15th or the 16th; is that right?
6  A. That -- that's right.
7  Q. Okay. This says the next day you informed
8  Marsha, the supervisor, that you were pregnant. Do you
9  know if that's correct?
10  A. Yes.
11  Q. You think that's right?
12  A. Because she asked me.
13  Q. Okay. And you don't know whether it was a
14  little bit later -- later that week?
15  A. No, it was that -- that day because it spread
16  quick, when I told the cashier and everybody knows.
17  Q. Okay. How long was it between the time that
18  you talked to Marsha and then you talked to Mr. G and he
19  told you to get a doctor's note?
20  A. It's between a week, like, five days, maybe.
21  I don't know. I can't remember exact date. But during
22  those weeks it's -- it's just the -- that my pregnancy
23  spread in the store. And then probably three, four days
24  after I spoke with Marsha, Mr. G told me to get the
25  note.

**Page 51**

1  Q. Okay. Tell me about that conversation.
2  A. I just -- I went to bring back the stuff for
3  the shelves, and then he kind of stopped me, saw me, you
4  know. Hey, you know, I don't want to jeopardize -- I
5  heard you're pregnant. Congratulations. I don't want
6  to jeopardize your pregnancy so I would like you to get
7  a note from your doctor.
8  Q. Okay. And where did that conversation take
9  place?
10  A. Inside the store, the Garth Road store.
11  Q. Okay. But was it, like, out on the sales
12  floor? Was it in his office?
13  A. Oh, no, it was just on the floor, sales floor.
14  Q. Okay. Were there any witnesses to that
15  conversation or was it just the two of you?
16  A. I don't know if anybody heard us.
17  Q. Do you remember where in the store that you
18  were talking? Was it -- was it at the front end or on
19  an aisle?
20  A. It was in, like, a -- after the front, the
21  cashier, like going to the -- to the aisles, in between.
22  Q. How long did that conversation take place?
23  A. It was quick. It wasn't really long
24  conversation.
25  Q. Okay. He didn't tell you that you were fired,

**Page 52**

1  right?
2  A. No, not -- not at that time.
3  Q. Okay. He didn't tell you that you -- you were
4  going to have any negative impact on your job, correct?
5  A. He did not.
6  Q. Your testimony is he just asked you to get a
7  note?
8  A. I thought I just, you know, get the note and
9  then, you know, keep working.
10  Q. Did he give you a deadline or anything as to
11  when you had to get the note?
12  A. No, he didn't.
13  Q. How long was it after that conversation that
14  you made your appointment with the doctor?
15  A. I called right away when I got home and set an
16  appointment.
17  Q. Okay.
18  A. And then she said -- she said she can -- I can
19  come see her on the 24th, and there she gave me a note.
20  Q. Okay. All right. Well, let's talk about your
21  doctor visit, which is back to Exhibit 3. And it's on
22  Page 6 is the -- the part that I was going to ask you
23  about. By the way, it has insurance as Medicaid at that
24  point. So you were -- you were on Medicaid --
25  A. Yes.

**Page 53**

1  Q. -- right? And it looks like it was an
2  8:40 a.m. appointment. Does that sound right?
3  A. Yes.
4  Q. And if you turn to the next page, under Social
5  History it says "occupation, homemaker."
6  A. Uh-huh.
7  Q. So you hadn't told --
8  A. Oh, no, I -- I told her. I -- she asked me
9  where -- where do I work. I -- I told her -- I told
10  her, I work for Kroger.
11  Q. Okay. Do you remember when -- when you --
12  A. I'm a bagger in Kroger.
13  Q. Okay. Do you remember when you told her that?
14  A. That -- during that visit I told her.
15  Q. Okay. If you look under -- on Page 7,
16  Prenatal Flowsheet, there's a chart sort of in the
17  middle there. Do you see that?
18  A. Uh-huh.
19  Q. And it says "27-year-old --"
20      That's you, right?
21  A. (Moving head up and down.)
22  Q. "-- at 7.2 weeks by LMP here for confirmation
23  of pregnancy visit. UPT positive." Do you see that?
24  A. Uh-huh.
25  Q. Okay. So you had been pregnant for a little

MERIAM SHAW - January 18, 2017

### Page 54

1  over seven weeks at this point, right?
2  A. I guess so.
3  Q. At least that's what the doctor says?
4  A. That's what the doctor said.
5  Q. All right. You don't have any reason to
6  disagree with the doctor, right?
7  A. Yeah, that -- that's what she said.
8  Q. Okay. So, again, just doing the math, I mean,
9  that would -- that would put the baby's conception
10 sometime -- if you look, you know, on the -- on the
11 chart here on Exhibit 4, that would put the baby's
12 conception sometime around February 2nd.
13 A. Okay.
14 Q. Do you have any reason to disagree with that?
15 A. That means my -- I was pregnant?
16 Q. That's what the doctor said, that you were
17 pregnant for a little over seven weeks.
18 A. If that's what she said. I don't know that I
19 -- I was pregnant.
20 Q. Okay. And you've been pregnant twice before,
21 right?
22 A. Yes.
23 Q. You've been through two pregnancies, correct?
24 A. Yes.
25 Q. Do you -- do you remember when was your first

### Page 55

1  menstrual period that you missed in 2014 when you were
2  pregnant?
3  A. It's -- you see, it's not -- it's not always
4  the same with period. I'm sure you have a wife. It's
5  not the same every --
6  Q. I've never been through it before --
7  A. It's not --
8  Q. -- so I'll defer to you.
9  A. It's not the same every month. And all the
10 pregnancy is not the same, as well. You have different
11 -- like, I was sick with my first baby. I wasn't sick
12 with my second baby. I was throwing up until, like,
13 seven months. But the second baby I never felt
14 anything. It was easy pregnancy. And that's the
15 difference so...
16 Q. Okay. But you -- you would agree with me that
17 you had missed at least one -- one period before March
18 24th, correct?
19 A. I don't miss. I did not miss period.
20 Q. Okay. So your testimony is that you had a --
21 a menstrual period in February?
22 A. I cannot -- I cannot recall missing period.
23 Q. Well, why -- why were you -- why did you think
24 you were pregnant? What -- what tipped you off or what
25 made you think that you were pregnant?

### Page 56

1  A. Because it's -- but I did not count the weeks.
2  It's been weeks I didn't have my period but I didn't
3  know it's been a month already. You know what I mean?
4  Like --
5  Q. Okay. Well, I -- I would like to know what --
6  what made you decide to go take a pregnancy test.
7  A. Because I'd been waiting for my period, and
8  until then I did not have the period.
9  Q. Okay.
10 A. So...
11 Q. How long was it overdue?
12 A. I don't know, probably five weeks, I don't
13 know. But sometimes you don't really -- sometimes
14 you're just delayed.
15 Q. Okay. And you had no other indications that
16 you were pregnant? You weren't feeling sick or anything
17 like that?
18 A. No, I didn't feel sick.
19 Q. So at the -- at this meeting or the
20 appointment with -- with Dr. Lowery, did you talk to her
21 about getting a note for work?
22 A. Yeah, I told her. I told her, My manager
23 asked me for a note; can you make me one? And she said,
24 Yeah. And then -- but then she asked what kind of job I
25 do.

### Page 57

1  Q. Okay. What did you tell her?
2  A. I told her, I'm a bagger.
3  Q. Did she ask you, like, you know, what your job
4  duties are?
5  A. Yes.
6  Q. Those kinds of things?
7  A. She asked me, and I told her, I -- I bag
8  groceries and I push carts. That was --
9  Q. Did you give her any -- I'm sorry. Go ahead
10 and finish.
11 A. That's all I told her.
12 Q. Did you give her any sort of job description
13 or any sort of paper that described what your duties
14 were?
15 A. No, I didn't bring anything.
16    (Exhibit No. 6 was marked.)
17 Q. Okay. Ms. Shaw, I've handed you what's been
18 marked as Exhibit 6 to your deposition. Have you seen
19 that document before?
20 A. Yes.
21 Q. Is this the note that Dr. Lowery gave to you?
22 A. Yes.
23 Q. And she checked the part that says, "Patient
24 may return to work on March 25th, 2014," which would
25 have been the next day, right?

## Page 58

1   A. Yes.
2   Q. "With the following restrictions: Cannot --
3   cannot lift anything greater than 15 pounds. Cannot
4   push stacked shopping carts." Do you see that?
5   A. (Moving head up and down.)
6   Q. Is that a "yes"?
7   A. Yes.
8   Q. Did you have any discussion with her about
9   these restrictions?
10  A. No.
11  Q. Did she tell you why she was giving you these
12  restrictions?
13  A. Because I had -- I had a -- I had two previous
14  --
15  Q. C-sections?
16  A. -- C-sections, and the one was critical, the
17  first one.
18  Q. Okay. So was -- was there some discussion
19  that she was doing this because of these previous
20  C-section surgeries and she was concerned?
21  A. Yeah.
22      MR. COSTEA: Objection, form.
23  Q. (By Mr. Barron) Did you have any discussion
24  with her about whether you needed to lift more than 15
25  pounds because that's what your job required?

## Page 59

1   A. No.
2   Q. Anything else about that conversation with
3   Ms. Lowery about the restrictions, that you can remember
4   here today?
5   A. No.
6   Q. After you received Exhibit 6 from your doctor,
7   what did you do with it?
8   A. I gave it to Emelia.
9   Q. Okay. Who is Emelia?
10  A. She's one of the supervisors.
11  Q. Do you remember when that was?
12  A. The next -- the -- the day, 25th.
13  Q. Did you have any physical restrictions with
14  your previous pregnancies?
15  A. I never need a note so I don't -- I --
16  Q. Did you work out --
17  A. They just say, Be careful.
18  Q. Okay, sorry. Did you ever work during your
19  two prior pregnancies?
20  A. No.
21  Q. Prior to your conversation with Mr. G about
22  needing a note, had you told anybody at Kroger that you
23  -- that you couldn't do something because you were
24  pregnant?
25  A. The only thing I can remember, I was -- I was

## Page 60

1   in pain and I needed a break, but then Marsha told me --
2   and it was raining, and Marsha told me to push carts
3   anyway.
4   Q. Was that before or after you had your doctor's
5   note?
6   A. After I gave her the note.
7   Q. Okay. And I want to ask about before, so
8   let's just focus on before. So before you had your
9   conversation with Mr. G and he told you to go get a
10  note, had you ever had a situation at work where you
11  said, I'm in pain, or I can't do something because of
12  being pregnant?
13  A. I don't recall.
14  Q. Okay.
15      MR. BARRON: Let's take a break. We've
16  been going about an hour.
17      MR. COSTEA: Okay, thank you.
18      MR. BARRON: If you could look that up
19  on your phone --
20      THE VIDEOGRAPHER: We're going off the
21  record, approximately 11:30 a.m.
22      (Brief recess.)
23      THE VIDEOGRAPHER: We're coming back on
24  the record, approximately 11:45 a.m.
25  Q. (By Mr. Barron) Ms. Shaw, did you have an

## Page 61

1   opportunity to check your Facebook to see what date it
2   was that you posted that?
3   A. Yes, I did.
4   Q. Okay. What was that date?
5   A. March 10th.
6   Q. March 10th?
7   A. 2014, yes.
8   Q. Okay. Can you read what it says?
9   A. I said: Proud to be part of the team, with
10  the -- and I put the -- I took picture of the face of
11  the manual.
12  Q. Okay. All right.
13      MR. BARRON: I'll get a copy of that
14  from you later.
15  Q. (By Mr. Barron) And then you -- you also were
16  going to check to see the date when you posted about
17  being pregnant, finding out you were pregnant.
18  A. Oh, I posted it -- it's March 14th, 2014. And
19  it says: I don't know if I should be celebrating. I
20  got a job, but I found out I'm pregnant again. My
21  stomach is hurting from seven-and-a-half-hour shift
22  today. Just hoping for a healthy pregnancy, and
23  hopefully my babies will accept their little sister or
24  brother.
25  Q. Okay. So was -- your stomach was hurting on

**Page 66**

1  Q. How long after you clocked in was it that you
2  talked to Emelia?
3  A. It wasn't long, probably less than five
4  minutes.
5  Q. And you -- and you had the paper with you?
6  A. Yes. I hand her the note.
7  Q. And then what did you do immediately after
8  handing her the note?
9  A. She told me, I can't keep you. And then so I
10  talked her into keeping me, because I -- I need a job.
11  I need to pay our gas bill and stuff. And she -- and
12  then she said, No, there's nothing here for you, blah,
13  blah, blah. And then I said, I can still do my job
14  and -- you know. And then she said that, Okay, go push
15  carts. And then it was raining and I pushed carts.
16       And then, like, probably I was 30
17  minutes outside. And then Mr. Trenton, he's like a
18  training supervisor, he saw me and said, Come back in
19  because it's raining. But I want to prove to Emelia
20  that I can still do my job.
21  Q. Okay. If you need a break, you let me know.
22  Okay?
23  A. So I did it. And then Mr. Trenton called the
24  guys to get the carts. And then so I went on break, I
25  went -- I stand in the side and then Emelia said, Go

**Page 67**

1  clock out and go home.
2  Q. You would agree that your -- your doctor's
3  note did allow you to -- to push carts, right? It just
4  says you can't pushed stacked carts.
5  A. Yes, I can push carts. That's why I told her
6  that I can do my job.
7  Q. Okay. So by -- for her to ask you to push
8  carts wasn't violating your restrictions, right?
9  A. It wasn't.
10  Q. Okay.
11  A. But it's, like, she is, like, Okay, then, go
12  do it. And then even if it was raining, she -- she's
13  being, I would say, insensitive.
14  Q. Did she ever tell you specifically you have to
15  go get carts in the rain?
16  A. No, but she knows it was raining, and then she
17  told -- she go -- told me anyway.
18  Q. Was it --
19  A. And I'm just a bagger so I do it.
20  Q. Was it pouring or raining --
21  A. Yeah, it's --
22  Q. -- or how hard?
23  A. Not that hard, but it was pouring, you know.
24  And they were -- they did not have any -- they did not
25  have any jackets to -- for us to use.

**Page 68**

1  Q. Were there umbrellas or something like a
2  rain -- raincoats?
3  A. Not at that time when I needed it.
4  Q. Okay. Did you ask?
5  A. I asked.
6  Q. Who did you ask?
7  A. Some of the guys, I don't remember him, but
8  some of the guys that was there for a while. I -- I
9  don't know, but I -- they said this -- this is where the
10  jacket at but you have to bring your own jacket, but I
11  didn't know --
12  Q. Okay.
13  A. -- so I did not have a jacket.
14  Q. Did you ever ask management for a jacket or
15  anything to help you get the carts in the rain?
16  A. No, I -- I feel like I wasn't welcome anymore
17  so I'm not gonna...
18  Q. So the answer is, no, you didn't do that?
19  A. I did not ask.
20  Q. All right. So you were getting baskets for a
21  while. Then what happened?
22  A. Then Mr. Trenton called me to get inside
23  because it's raining and -- and then he sent some guys
24  to do it, bring carts inside the store.
25  Q. And then what did you do?

**Page 69**

1  A. I was just standing there. And then Emelia
2  came up to me and said -- oh, I was going back to help
3  the other guys. And then Emelia called me to the side
4  -- to the side and said, Go clock out and go home.
5  Q. I want to talk -- I want to direct your
6  attention back to Exhibit 5, which is your EEOC charge.
7  Do you see that? Go ahead and find it. Do you see your
8  charge?
9  A. Yes.
10  Q. Okay. And if you look down at the bottom it
11  says, "I declare under penalty of perjury that the above
12  is true and correct," right?
13  A. Yes.
14  Q. So you swore to tell the truth in this charge,
15  didn't you?
16  A. Yes.
17  Q. And if you look in the middle where it says --
18  it talks about your conversation with Emelia. "I told
19  her that I can still do my job, such as bagging
20  groceries and pushing not more than six carts at a time.
21  I went and brought carts back to the store but then I
22  rested because I felt some pain. I clocked out, and
23  then I went upstairs to talk to the head manager,
24  Mr. G." It does not say in your charge that Emelia told
25  you to go home, does it?

MERIAM SHAW - January 18, 2017

### Page 70

1  A. I missed putting that, but he -- she did.
2  That's why -- I wouldn't clock out because I was still
3  on the schedule, but she told me to clock out.
4      Q. Ms. Shaw, please answer my question. In your
5  charge, where you swore to tell the truth, that you
6  filed the next day, you don't have anything in here
7  about Emelia telling you to go home, do you?
8      A. Not in the charge, but she told me.
9      Q. And this was filed March 26th, 2014, right?
10     A. (Moving head up and down.)
11     Q. Right?
12     A. Yes.
13     Q. Okay. In your charge you say that you rested
14  because you felt some pain. Is that true?
15     A. Yes.
16     Q. Okay. So what pain were you feeling on that
17  day?
18     A. The same pain in my side.
19     Q. Okay. Describe it for me.
20     A. It's just cramps in my side.
21     Q. Had you felt that pain before?
22     A. Yes, when I got home from work.
23     Q. Okay. How many times had you felt that pain
24  in March of 2014?
25     A. It's just probably four times.

### Page 71

1      Q. When did it start?
2      A. That day when I posted on Facebook, the 14th.
3      Q. Okay. And did you sometimes have it on days
4  where you didn't work?
5      A. Not really. I did not feel it.
6      Q. Did you tell anybody at the store that you
7  were in pain?
8      A. I don't recall.
9      Q. In your EEOC charge it says that you clocked
10  out and then you went upstairs to talk to the head
11  manager, Mr. G?
12     A. Yes.
13     Q. Are you sure that that was the same day?
14     A. Yes. I went -- I went out -- I was going to
15  go home, and I saw my phone lying in the car -- in my --
16  my chair, car -- car chair, so I -- I got an idea of
17  recording him.
18     Q. All right. I want to make sure I understand
19  the sequence of events, though. You punched out and
20  left without telling anybody you were doing that, didn't
21  you?
22     A. No, because Emelia told me to clock out. He
23  told -- she told me to clock out. That means I lost --
24  I don't have a job anymore. She -- I was -- I'm -- I'm
25  in the clock but she told me to get out of the store,

### Page 72

1  so...
2      Q. Did anybody -- was anybody around when she
3  told you that?
4      A. There was people but I don't think they were
5  paying attention to us. They were busy with their own
6  jobs.
7      Q. Was Mr. G there in the store when she told you
8  to clock out and leave?
9      A. He was in the office.
10     Q. Okay. Well, why wouldn't you have gone over
11  and -- and talked to him?
12     A. That's what I did. That's why I -- I confirm
13  to him that I'm -- am I really fired, you know.
14     Q. All right. Your -- your testimony is that you
15  immediately, after Emelia told you to leave, went over
16  and talked to Mr. G?
17     A. Yes.
18     Q. Or did you go out to your car first?
19     A. I went out to my car.
20     Q. Why did you go out to your car?
21     A. So I can have a -- a evidence that they are
22  firing me without -- because I need that. I can't just
23  -- because of my babies' Medicaid, I can't just, you
24  know, lose the job. I have to have a -- I'm not going
25  to quit a job.

### Page 73

1      Q. How long was it when you punched out until you
2  went out to your car and got your phone and came back
3  in?
4      A. It was just five minutes.
5      Q. Have you ever secretly tape-recorded anybody
6  before?
7      A. Never.
8      Q. This is the first time?
9      A. This is the first time.
10     Q. And your -- your testimony was that you had
11  never had any discussions with anybody at Kroger where
12  there was a problem before the 25th?
13     A. Never.
14     Q. Right?
15     A. Never.
16     Q. So the first time that Emelia gives you a
17  problem, your first thought is to go out to your car and
18  grab your phone to secretly record someone?
19     A. Because I can't be -- I can't be -- I can't
20  resign. I can't quit a job. When you have a Medicaid
21  and you have this government assistance, they need you
22  to have a job. You need to have a job. They're helping
23  you for -- because you have a low income, but you have
24  to have a job. And that's what I understand, so I need
25  to prove to them that I did not quit my job. They fired

MERIAM SHAW - January 18, 2017

**Page 74**

1  me. I want my job. Because we work with the Work
2  Source. They -- like, they send us to trainings, you
3  know, and -- to get the babies Medicaid.
4      Q. So you go out to your car and you get your
5  phone. Is it the same phone that you have with you
6  today?
7      A. No.
8      Q. What kind of phone was it?
9      A. It was from eBay, which is gone.
10     Q. Okay.
11     A. It was a cheap phone.
12     Q. Was it, like, an iPhone or something?
13     A. No.
14     Q. Okay. What kind of -- you don't remember what
15  kind of phone it was?
16     A. It was, like, a copy cat of the Samsung. It
17  was an imitation.
18     Q. So you got your phone, you brought it back in.
19  Where did you hide it?
20     A. Like, under my shirt.
21     Q. Okay. And did you ask to meet with Mr. G, or
22  how did you end up meeting with him?
23     A. I just showed up in the office, and I asked if
24  he was there. And then Jason said that Meriam was --
25  Meriam is here. And then he let me come in, and I start

**Page 75**

1  asking him, you know, if I can keep my job, because
2  Emelia, they're not communicating and she just fired me.
3      Q. Okay. Here's what we're going to do. In this
4  -- your lawyer has given me a copy of the tape, so we're
5  going to play -- play it here in a minute. But first I
6  would like to ask you some questions about that. Have
7  you ever talked to Mr. G before?
8      A. Before?
9      Q. Before that meeting on the 25th of March.
10     A. The one on the recording?
11     Q. Yeah.
12     A. The only time I would say, Hey, Hello, and
13  then the -- the time that he asked me for the note.
14     Q. Okay. The conversation on the 25th, how long
15  did it take?
16     A. Probably 12 -- 10 minutes, 12 minutes.
17     Q. And where did it take place?
18     A. In his office.
19     Q. Was anybody else there?
20     A. Jason was there.
21     Q. What about Emelia?
22     A. She was not there.
23     Q. Did Mr. G already know about your conversation
24  with Emelia?
25     A. He sounded like he's expecting it.

**Page 76**

1      Q. Okay. Did he -- did he mention Emelia in the
2  conversation?
3      A. No, I did. I told her -- him about Emelia
4  saying that I don't have -- she can't keep me.
5      Q. Do you know if Mr. G had seen your doctor's
6  note at this point?
7      A. I guess he -- I guess he did, because the way
8  he told me, he said about my restriction.
9      Q. Okay. But do you -- do you know if Emelia had
10  given the -- your doctor's note to Mr. G by the time you
11  had that meeting with him?
12     A. He -- he must have.
13     Q. Okay. Well, why would he must have? How do
14  you know that?
15     A. Because he told me when I recorded him that --
16  that my restriction, I can't -- Nobody works in my
17  store, like, with that restriction.
18     Q. Did he have the paper in the meeting?
19     A. He did not.
20     Q. Okay. You didn't see the paper in the meeting
21  with Mr. G?
22     A. No.
23     Q. You don't know what Emelia did with it?
24     A. I don't know.
25     Q. Did anybody tell you or recommend that you

**Page 77**

1  tape this conversation?
2      A. No.
3      Q. Did you have any conversations with your
4  husband or anybody else about the fact that you were
5  going to tape this conversation?
6      A. No.
7      Q. This was all your idea?
8      A. My idea.
9      Q. Do you know if it's lawful to tape a
10  conversation, with people not knowing that they're being
11  taped?
12     A. I don't know.
13     Q. So it could be illegal and you could go to
14  jail?
15     A. Yes.
16     Q. You never asked anybody if it was legal in
17  Texas to do that?
18     A. I never asked.
19     Q. Do you know if it's a violation of Kroger
20  policy to tape other people in the store without them
21  knowing they're being taped?
22     A. I didn't know. I -- I don't know.
23     Q. Would you want somebody taping you in the
24  workplace without you knowing?
25     A. I don't mind. I'm not going to say anything

MERIAM SHAW - January 18, 2017

### Page 82

1  husband about, Hey, I'm going to go back in and tape
2  Mr. G?
3     A.  I told him --
4        MR. COSTEA:  Well, hold on.  Hold on one
5  second.  We are getting into conversations between the
6  husband and the wife, and those conversations are
7  privileged by the spousal communication privilege.  I'm
8  going to instruct the witness, my client, not to
9  disclose any conversation that she had with her husband.
10       Do you understand what I just said,
11 Ms. Shaw?
12       THE WITNESS:  Yes.
13       MR. COSTEA:  Okay.
14    Q.  (By Mr. Barron) Ms. Shaw, when you went out
15 to your husband who was picking you up, how much time
16 did you spend in the car?
17    A.  I didn't spend any time.  I just grabbed my
18 phone.
19    Q.  So you're not feeling well at this point,
20 right?  Is that your testimony?
21    A.  Yes.
22    Q.  You're sick, your -- your side hurts, right?
23    A.  Yes, but I can still walk.
24    Q.  Okay.  So your -- your side hurts, you're not
25 feeling good, you complained, your babies are sitting in

### Page 83

1  the car, your husband is waiting for you, and yet you
2  decided to go back in with your phone to tape Mr. G.  Is
3  that what happened?
4     A.  That's because she -- he said I can't --
5  Emelia said I can't go back to work.  He said -- she
6  said, I -- I -- she can't keep me.  And if I'll just go
7  home without any clarification, then I don't have a job.
8     Q.  Well --
9     A.  That means I can't -- I don't have a job
10 anymore.
11    Q.  Why wouldn't you have just gone and talked to
12 Mr. G before you walked out?
13    A.  I just have a feeling they're not -- they
14 don't like me there anymore.
15    Q.  All right.  Let's listen to some more of the
16 tape.
17        (Playing audio file.)
18    Q.  (By Mr. Barron) Okay.  I hear you talking
19 there.  Do you know who you were talking to?  Did you
20 hear that?
21    A.  That was Jason.
22    Q.  Okay.
23        (Playing audio file.)
24    Q.  (By Mr. Barron) Okay.  The first thing he
25 said -- Mr. G said was, You just walked out, right?  Did

### Page 84

1  you hear him say that?
2     A.  I walked out to get my phone.
3     Q.  You -- you really, under oath, are saying that
4  he was talking about you walking out to get your phone
5  and not walking off the job?
6     A.  I did not walk out from my job.
7     Q.  Well, Mr. G thought you walked off the job,
8  didn't he?
9     A.  He thought -- Emelia told me to clock me --
10 clock out.
11    Q.  Okay.
12        (Playing audio file.)
13    Q.  (By Mr. Barron) Okay.  I'm going to stop it
14 right there.  You asked Mr. G whether you could keep
15 your job, right?
16    A.  (Moving head up and down.)
17    Q.  And he told you, he says, I don't know, I need
18 to talk to Human Resources, right?
19    A.  (Moving head up and down.)
20    Q.  Okay.  Is that a "yes"?
21    A.  Yes.
22    Q.  He never told you you were fired, did he?
23    A.  Yes.
24    Q.  He did?
25    A.  He did.

### Page 85

1     Q.  I mean, you recorded it.  You should know,
2  right?
3     A.  He did not, but Emelia did.
4     Q.  Okay.  So just so we're clear, Mr. G never
5  told you you were fired --
6     A.  Not --
7     Q.  -- on March 25th, correct?
8     A.  Not Mr. G.
9     Q.  In fact, he told you the opposite.  He said, I
10 don't know.  I need to check with HR because you've
11 given me these restrictions, right?
12    A.  Yes.
13        (Playing audio file.)
14    Q.  (By Mr. Barron) Ms. Shaw, you were asking
15 that if employees get pregnant they're not allowed to
16 work.  Is that what you were going to ask him?
17    A.  (Moving head up and down.)
18    Q.  Is that a "yes"?
19    A.  Yes, that's what I tried to ask him, if
20 somebody get pregnant if they're just going to fire
21 them.
22    Q.  And -- and you knew you were tape-recording
23 the conversation, right?
24    A.  Yes.
25    Q.  You were trying to set him up.  You wanted him

MERIAM SHAW - January 18, 2017

## Page 86

1  to say that -- that Kroger fires employees that are
2  pregnant, didn't you?
3      MR. COSTEA: Objection, form.
4      A. I -- I am comparing my -- my -- my status and
5  giving him example, like me, I'm pregnant. Is that what
6  they do to all pregnant employees?
7      Q. (By Mr. Barron) Why would you -- why would
8  you even ask that?
9      A. Because why would they fire me? Why would
10 Emelia fire me? I just got pregnant, and I can still do
11 my job.
12     Q. Well, you -- you just brought Kroger a
13 doctor's note that says you can't do your job, right?
14         MR. COSTEA: Objection, form.
15     A. No.
16     Q. (By Mr. Barron) Well, let me back you up,
17 back it up a couple of steps here. You agree that it
18 was your job at Kroger to lift things more than 15
19 pounds, right?
20     A. When -- when I wasn't pregnant, I applied, I
21 wasn't pregnant and, yes, I could do that job.
22     Q. I understand. But you -- you were given a
23 document that said it's part of your essential job
24 functions as a sacker to lift regularly things that
25 weigh more than 15 pounds, right?

## Page 87

1      A. If I'm not pregnant?
2      Q. Do you -- do you think that that -- that job
3  description doesn't apply to you if you're pregnant?
4      A. Yes, it applies to me, but they should not
5  fire me because I'm pregnant. I can still do my job.
6      Q. And no -- and Mr. G did not tell you you were
7  fired at any point in that conversation?
8      A. I told you Emelia told me, and she -- I follow
9  her because she is my supervisor.
10     Q. Well, Mr. G is above Emelia, right?
11     A. But they did not talk to each other about
12 firing me. Why would Emelia fire me and not Mr. G?
13         MR. BARRON: Objection, nonresponsive.
14     Q. (By Mr. Barron) Mr. G is above Emelia,
15 correct?
16     A. Above Emelia; but he did not say, yes, you're
17 welcome to work in my store. He -- he obviously said --
18 it's the same thing he said, that, Nobody works in my
19 store that can't lift 15 pounds.
20     Q. He -- and he told you why, didn't he? Because
21 everything that goes through -- not everything, but many
22 things that go through --
23     A. It's not true.
24     Q. Hold on. He told you why, which was that many
25 things that go through the check stand weigh more than

## Page 88

1  15 pounds, right?
2      A. Yeah, but cashier don't lift it. If they --
3  if they would give me a different job which I can do,
4  they can train me for anything else, you know.
5      Q. Is your testimony that the cashier doesn't
6  have to lift bags of dog food or cases of water?
7      A. They don't have to lift it. They have this --
8  a handheld scanner that they just scan it, and baggers
9  are the one bagging it, you know.
10     Q. But on occasion they do have to lift those
11 things, don't they?
12         MR. COSTEA: Objection, form.
13     A. Not if they want to, no.
14     Q. (By Mr. Barron) Well, if you get -- if the
15 bag of dog food is upside down and you can't get to the
16 UPC code to scan it, someone is going to have to lift it
17 up and turn it over, right?
18     A. And it's the baggers.
19     Q. And if there's not a bagger around, who has to
20 do it?
21         MR. COSTEA: Objection, form.
22     Q. (By Mr. Barron) It would be the cashier,
23 correct?
24     A. No.
25     Q. Let's continue.

## Page 89

1          (Playing audio file.)
2      Q. (By Mr. Barron) Let me stop it there. Mr. G
3  asked you if you told your doctor what you did, and you
4  said no.
5      A. Continue it. I said yes.
6          (Playing audio file.)
7      Q. (By Mr. Barron) So your testimony is you told
8  him that -- you told your doctor that you were a bagger?
9      A. Yes. She asked me, so I told her what I do.
10     Q. Okay. And knowing full well what you did, the
11 doctor still put a lifting restriction of 15 pounds on
12 you, right?
13     A. Yes, and it's not my fault that she put that.
14         (Playing audio file.)
15     Q. (By Mr. Barron) So in -- in this part of the
16 tape Mr. G tells you that you could go back to your
17 doctor and talk to your doctor about whether that's a
18 good restriction for you, whether that really is what
19 you need; and if it changes then you could come back,
20 right?
21     A. (Moving head up and down.)
22     Q. Is that a "yes"?
23     A. Yes, he said that.
24     Q. Did you ever go back to Dr. Lowery and have a
25 talk with her about your restrictions?

MERIAM SHAW - January 18, 2017

### Page 90

1  A. No.
2  Q. Why not?
3  A. Because Emelia already fired me, and I have to
4  deal with Emelia. She is the supervisor.
5  Q. So you never even tried to go talk to your
6  doctor about your restrictions and see if the -- these
7  restrictions were really necessary?
8  A. I did not try.
9  (Playing audio file.)
10  Q. (By Mr. Barron) I'm going to stop it there.
11  You -- on the tape you ask Mr. G for something in
12  writing.
13  A. That I am terminated.
14  Q. All right. Why would you ask him for that?
15  A. Because I need that for my -- for the Work
16  Source, because I have Medicaid and it -- it's going to
17  -- hard for me to get the benefits without having a job,
18  because they will give you extension to look for a job
19  if you did not quit your job.
20  Q. Okay.
21  A. And I -- I don't quit my job.
22  Q. How did you know that you needed that document
23  before that day? Because you had never had a job in --
24  in the United States.
25  A. My husband did -- lost his job, and so we had

### Page 91

1  to deal with that, you know, for -- to get the babies.
2  (Playing audio file.)
3  Q. (By Mr. Barron) Did you hear Mr. G say that
4  you were the one who walked out earlier? Did you hear
5  that on the tape?
6  A. I did not walk out. Emelia told me to clock
7  out.
8  Q. Okay. You did not say anything back to Mr. G
9  that, Oh, I didn't work out -- I didn't walk out, did
10  you?
11  A. I told him that Emelia told me to clock out --
12  Q. You --
13  A. -- that she can't keep me in the job.
14  Q. Is your testimony that you told him that on
15  the tape?
16  A. Not on the tape.
17  Q. Well, you taped the entire conversation,
18  didn't you?
19  A. Yes.
20  Q. So you never --
21  A. With Mr. -- with Mr. G, yes; with Emelia I
22  didn't tape her.
23  Q. I understand. But Mr. G clearly was under the
24  impression that you walked off the job, right, because
25  that's what he just said. We all heard him, right?

### Page 92

1  A. That's what he thinks.
2  Q. And you never told him, That's wrong. Emelia
3  told me to leave, right?
4  A. I told -- I told him that Emelia told me she
5  can't keep me. That's why I went there to confirm with
6  him. That's the reason I went there.
7  Q. You never said, Mr. G, you got it wrong. I
8  didn't walk off the job. You never told him that, did
9  you?
10  A. I never did, yes.
11  (Playing audio file.)
12  Q. (By Mr. Barron) The other voice at the very
13  end of the tape talking, is that your husband?
14  A. (Moving head up and down.)
15  Q. And that was your baby we could hear crying in
16  the back -- background?
17  A. Uh-huh.
18  Q. And he asked you, What did they say, right?
19  A. Yes.
20  Q. We heard him on the tape say that, right?
21  A. Yes.
22  Q. And you said, Shh, right?
23  A. Yes.
24  Q. Because you didn't want your conversation with
25  your husband to be taped --

### Page 93

1  A. Well --
2  Q. -- right?
3  A. -- it's not none of other people's business.
4  Q. Right. You wanted to make sure you turned it
5  off so that we couldn't hear what you were going to
6  have -- talk with your husband about, right?
7  A. Yeah, he just asked about the papers. Because
8  he didn't know I was going to tape him. I was just
9  going to ask him for the papers.
10  Q. What papers were you supposed to ask about?
11  A. For the -- the -- for terminating me, that I'm
12  not employed anymore.
13  Q. Why would your husband want termination
14  papers?
15  A. Because we need it for -- like I said, for --
16  when he lost his job, we can only get, like, extension,
17  they give you a training. You have to prove that --
18  that you don't quit your job.
19  Q. So if you got termination papers from Kroger,
20  you would have been able to stay on the benefits without
21  having a job for a period of time, right?
22  A. For probably one month. They -- but they --
23  they send you to training. Like, you have to volunteer
24  for Goodwill, you have to volunteer for the, you know,
25  government stuff, while you're looking for a job.

**Page 94**

1  Q. So it was important to you to get that paper,
2  right?
3  A. Yeah, for the babies.
4  Q. So we've already established that you did not
5  go back to your doctor to ask for any sort of change to
6  your restrictions, right?
7  A. No, yeah.
8  Q. Even though that's what Mr. G told you you
9  needed to do if you wanted to have any further
10 discussion about working at Kroger, right?
11 A. Yes.
12 Q. Yet the next day you called and -- and talked
13 to Jason Poitras, right?
14 A. Yes.
15 Q. And you taped that conversation, as well?
16 A. Yes.
17 Q. Why?
18 A. To confirm that I don't have a job there
19 anymore.
20 Q. But he didn't tell you that, did he?
21 A. He said if I go back to my doctor and change
22 my restriction.
23 Q. Well, he told you the same thing that Mr. G
24 told you.
25 A. Yes.

**Page 95**

1  Q. All right. Let's listen to that one. By the
2  way, before we get too far into it, where were you when
3  you had this conversation with Jason?
4  A. I went -- I went -- consult a lawyer, what to
5  do. Because I was searching in Google and what's my
6  right and what can I do. And so I end up reading the
7  EEOC stuff and Google, and I just went, consult a lawyer
8  that can help me.
9  Q. Okay. So your conversation with Jason was the
10 day after your -- your conversation with Mr. G, right?
11 A. The next day, yeah.
12 Q. Right. That's also the day you filed your
13 EEOC charge, Exhibit 5, correct?
14 A. Yes, my -- the attorney filed it for me.
15 Q. Who was the attorney?
16 A. Steve Petrou.
17 Q. That's a different attorney than Mr. Costea?
18 A. That's different. He got sick.
19 Q. Did you actually visit with Mr. Petrou on the
20 26th?
21 A. Yes.
22 Q. You went to his office?
23 A. Yes.
24 Q. How long did you meet with him?
25 A. Probably an hour to -- hour or two, something

**Page 96**

1  like that.
2  Q. Have you ever hired a lawyer before? Have you
3  ever hired a lawyer before?
4  A. Never.
5  Q. How did you find Mr. Petrou?
6  A. I just Googled.
7  Q. And you called up, and he happened to have an
8  appointment -- appointment available for you that same
9  day?
10 A. Yes.
11 Q. And --
12 A. I think I called him before that, like when I
13 got home, like before the appointment of that day. I --
14 I don't recall what day I called him, but he --
15 Q. Well, I would kind of like to know. When --
16 when -- when is the best recollection of when you called
17 Mr. Petrou?
18 A. Probably in that afternoon of -- that they
19 fired me, because I went -- I came home, I start
20 Googling stuff, what can I do.
21 Q. All right. So you think -- your best
22 recollection is you talked to him on the 25th and you
23 met with him on the 26th?
24 A. Yes.
25 Q. Okay. And on the -- the 26th you signed the

**Page 97**

1  EEOC charge?
2  A. Yes.
3  Q. But you were not physically at the EEOC's
4  offices?
5  A. No, that was in -- in his office.
6  Q. Did you call Jason from his office?
7  A. Yes.
8  Q. Were there any witnesses, other than you and
9  your lawyer, to that conversation with Jason?
10 A. No.
11 Q. Was your lawyer listening in?
12 A. Yes.
13    (Playing audio file.)
14 Q. (By Mr. Barron) Let me stop you there. On
15 the tape you had asked for Emelia. Why did you ask for
16 Emelia?
17 A. Because she's the one that fired me.
18 Q. But she's not the store manager, right?
19 A. But she's my supervisor. I have to
20 communicate with her. She is like --
21 Q. She's a --
22 A. She's my main supervisor.
23 Q. What was her position, do you know?
24 A. All they say is I have to deal with her.
25 She's my supervisor.

MERIAM SHAW - January 18, 2017

## 102

1  A. -- won't take my case --
2      MR. COSTEA: Excuse me. Excuse me.
3  Excuse me. Don't talk over one another, and do not
4  disclose anything that your attorney has said to you.
5      Q. (By Mr. Barron) Go ahead. You can answer the
6  question.
7      A. No.
8      Q. You're not going to answer my question?
9      A. Emelia fired me, and that's all. Because they
10 will not work with me, and they just fired me because
11 I'm pregnant. They don't want to pay -- they don't want
12 to take a risk of me getting hurt, because they said
13 they're going to -- you know, Kroger will have to pay
14 the doctor if I get hurt, if I take -- stay there and
15 work as being pregnant.
16     MR. BARRON: I'm going to object to that
17 as being nonresponsive.
18     Q. (By Mr. Barron) Jason, on the tape, told you
19 specifically that you were not fired, right?
20     A. Because he didn't know what Emelia said. They
21 don't communicate.
22     Q. He told you you were not fired, correct?
23     A. No.
24     Q. That's not what he told you?
25     A. And I told him, Emelia told me I was fired.

## 103

1  Q. Well, I guess the tape speaks for itself.
2      (Playing audio file.)
3  Q. (By Mr. Barron) Let me stop you there. Where
4  did you get the word "accommodation" from?
5  A. I read it in the EEOC --
6  Q. Okay. So you --
7  A. -- when I Googled.
8  Q. So you studied up in the --
9  A. Yes.
10 Q. -- in the day that you had between the -- the
11 conversation with Mr. G and the conversation with --
12 with Jason?
13 A. Yes. The thing is I -- when I handed her the
14 note, she should just have went to Mr. G and talked
15 about my situation, rather than just close the door on
16 me, just shut me out and just, Get out, and you're not
17 welcome here. That's the reason why I -- I felt
18 horrible. Because I -- it -- I worked hard to get the
19 job. Even just a bagger, their process of hiring you is
20 not easy. And -- and just like saying, Okay, you're
21 pregnant, good-bye, you know, it's -- it's not easy.
22 Q. Well, ma'am, no one ever said that, Because
23 you're pregnant, good-bye. In fact, you didn't have any
24 issues at all at Kroger until you brought them a note
25 that said you can't --

## 104

1  A. And they asked that.
2  Q. Hold on. Let me finish my question.
3      You didn't have any problems at Kroger
4  until you brought them a note that said you can't lift
5  more than 15 pounds, right?
6  A. And why they have to ask me a note? Is that
7  necessary, the note? Why they have to ask me to bring
8  the note?
9  Q. So that --
10 A. I was just pregnant, and I can still do my
11 job. It started when I give the -- Mr. G asked the
12 note, and I give the note, I give what they want. And
13 then instead of just, you know, bringing me in the
14 office, talking to me nicely -- I was probably more
15 emotional because I'm pregnant. Instead of, you know,
16 just, Okay, you know, let's talk. Go -- if they're nice
17 to me, I -- I would probably go to my doctor and say,
18 Can you please take off that restriction? Because I
19 need a job. And they were not nice to me. So I feel
20 like I was humiliated, like, in front of the store and
21 just, you know. So I look up my rights, and that's the
22 reason why I went online and just read and study what I
23 can do.
24 Q. Okay.
25     (Playing audio file.)

## 105

1  Q. (By Mr. Barron) Okay. That's the end of the
2  recording. Did you tape any other conversations with
3  Kroger employees?
4  A. No more.
5      MR. BARRON: Okay. Let's take a break.
6      THE VIDEOGRAPHER: We're going off the
7  record, approximately 12:49 p.m.
8      (Brief recess.)
9      THE VIDEOGRAPHER: We're coming back on
10 the record, approximately 1:01 p.m.
11 Q. (By Mr. Barron) Ms. Shaw, you understand
12 we're back on the record and you're still under oath?
13 A. Yes.
14 Q. After you spoke to Jason Poitras on the phone
15 at your lawyer's office, did you ever speak with anybody
16 at Kroger again?
17 A. No, not that -- I don't -- not that I
18 remember.
19 Q. And you never brought back any sort of
20 additional doctor's notes or -- or documentation --
21 A. No.
22 Q. -- to Kroger?
23 A. No.
24 Q. How did you find out that you were officially
25 separated from Kroger?

MERIAM SHAW - January 18, 2017

---

**Page 134**

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF TEXAS
            HOUSTON DIVISION
MERIAM SHAW          )
                     )
VS.                  ) CIVIL ACTION NO.
                     )  4:16-CV-01163
KROGER TEXAS, LP     )
```

REPORTER'S CERTIFICATION TO THE
DEPOSITION OF MERIAM SHAW
TAKEN ON JANUARY 18, 2017

I, MYLINDA TUBBS FAIRCLOTH, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MERIAM SHAW was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness.

That the deposition transcript was made available on January 31, 2017 to the witness or to the attorney for the witness for examination, signature, and return to Advantage Reporting Service by March 3, 2017.

That the amount of time used by each party at the deposition is as follows:
    Mr. Peter Costea - (no time used);
    Mr. David L. Barron - 2 hours, 40 minutes.

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:
    Mr. Peter Costea, Attorney for Plaintiff;

**Page 135**

    Mr. David L. Barron, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Further certification requirements will be certified to after they have occurred.

Sworn to by me this 31st day of January, 2017.

_____
MYLINDA TUBBS FAIRCLOTH, CSR
Certification No. 2896
Expiration Date: 12-31-18
ADVANTAGE REPORTING SERVICE
Registration No. 378
P.O. Box 169
Tomball, Texas 77377
281.376.9303
Fax 281.376.7117

**Page 136**

COURT REPORTER'S FURTHER CERTIFICATION

The original deposition transcript or Changes and Signature page \_\_\_\_\_ was or \_\_\_\_\_ was not returned to the deposition officer. If returned, date received:
_____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition transcription was delivered to Mr. David L. Barron for safekeeping on
_____;

That a copy of this certificate was served on all parties shown herein.

Witness my hand this _____ day of _____, 2017.

_____
MYLINDA TUBBS FAIRCLOTH, CSR
Certification No. 2896
Expiration Date: 12-31-18
ADVANTAGE REPORTING SERVICE
Registration No. 378
P.O. Box 169
Tomball, Texas 77377
281.376.9303
Fax 281.376.7117